**Neil TUGG, Christine Ponder, and Jan Carpenter, individually and on behalf of all others similarly situated, Plaintiffs,**

v.

**Jim TOWEY as Secretary of the Department of Health and Rehabilitative Services, State of Florida, and Anita Bock, as District Supervisor of District XI of the Department of Health and Rehabilitative Services, State of Florida, Defendants.**

No. 94–1063–CIV.

United States District Court,
S.D. Florida,
Miami Division.

July 19, 1994.

Jay M. Levy, P.A., Barbara Kornblau, R. Cory Schnepper, Miami, FL, for plaintiff.

Chesterfield Smith, Jr., Asst. Atty. Gen., Dept. of Health and Rehabilitative Services, Office of the General Counsel, Tallahassee, FL, for defendant(s).

## ORDER ON MOTION FOR PRELIMINARY INJUNCTION[1]

K. MICHAEL MOORE, District Judge.

THIS CAUSE came before the Court upon the Plaintiffs' Motion for a Preliminary Injunction (May 31, 1994). After consideration of the Motion, responses thereto, the argument of counsel at a hearing on June 24 and June 27, 1994, and the pertinent portions of the record, the Court enters the following Memorandum Order.

### I. BACKGROUND

The Plaintiffs are deaf and hearing impaired individuals and members of their families who receive mental health counseling from the Deaf Services Bureau, Inc. ("DSB"), a non-profit agency that provides various services to the deaf and hearing impaired in Dade and Monroe counties. Plaintiff Neil Tugg is a 40–year–old deaf man who sought counseling from DSB to cope with trauma caused by Hurricane Andrew. Plaintiff Christine Ponder is the grandmother and legal guardian of Christopher Patterson, a 15–year–old deaf high school student. Christopher Patterson and his grandmother, who is not deaf, both receive counseling from the DSB. Jan Carpenter is the mother of Jessica Carpenter, an 11–year–old deaf elementary school student. Jessica Carpenter and her mother, who is not deaf, both receive counseling at the DSB. The Defendants are officials of the Department of Health and Rehabilitative Services ("HRS"). Defendant

Anita Bock is the District Supervisor of HRS District XI, serving Dade and Monroe counties. Defendant Jim Towey, is the statewide head of HRS in Tallahassee.

HRS has funded DSB's mental health counseling through a contract with the DSB ("the Contract"). The original duration of the Contract was April 1, 1993 through November 30, 1993. The Contract was subsequently renewed two additional times; first from November 30, 1993 through May 31, 1994 and a second time from June 1, 1994 through June 30, 1994. Over its lifetime, the Contract has had two sources of money. The first source was a grant from the Federal Emergency Management Agency ("FEMA"), to provide crisis counseling to victims of Hurricane Andrew. The FEMA funding, which ceased on May 31, 1994, paid for two mental health counselors at DSB: David Killam, who is deaf, and Darlene Watson, who is hearing impaired. The second source was the state of Florida's special hurricane trust fund. That money is intended to pay for a telephone "hot line" counselor, that has not yet been filled. The "hot line" funding is currently available through January 31, 1995. No money from HRS's general budget was spent on the Contract. The June extension of the FEMA funding was from "lapsed" FEMA funding.

Counseling services provided by the DSB include individual and group counseling, telephone and peer support counseling. These services are provided on an out-patient basis at no fee to the client. DSB employs two Masters Degree-level counselors, three peer counselors and one tri-lingual staff interpreter. (Aff. of Stephen Bail, at par. 9). During the 14–month period from April 1993 through May 1994, DSB handled 11,046 requests for mental health services, an average of 42 requests each day. (Bail Aff., at par. 12). It costs DSB approximately $20,000 to provide these services each month. (Bail Aff., at par. 13).

After the termination of the DSB Contract, HRS intends to continue to provide counsel-

---

**1.** This Memorandum Order will fully set forth the Court's reasoning behind its entry of a Preliminary Injunction in its Interim Order of June 30, 1994. The terms of the Interim Order shall remain in effect and are not intended to be modified by this Memorandum Order.

ing services to the deaf and hearing impaired through other mental health providers under contract with the agency. These services are to be provided by hearing counselors aided by a sign language interpreter, at no additional cost to the client. The Plaintiffs contend that utilizing interpreters for the provision of mental health counseling violates the Americans with Disabilities Act ("ADA"), 42 U.S.C. Sec. 12101, *et seq.* and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. Sec. 794.

The Court held a hearing on the Plaintiffs' Motion for a Preliminary Injunction on Friday, June 24 and Monday June 27, 1994. At the hearing, the Plaintiffs presented evidence in support of their contention that mental health counselors aided by an interpreter do not provide "equal" services to the deaf as counseling provided by HRS to the general public and thus violate the regulations promulgated under the ADA. *See* 28 C.F.R. Sec. 35.130(a), (b)(1)(ii) and (iii).

The Plaintiffs argued that equivalent mental health services could only be provided by counselors, deaf or hearing, with sign language ability, who have a sufficient knowledge and understanding of the deaf community. The Plaintiffs petitioned the court to enter an injunction requiring the Defendants to devise a means of providing equivalent mental health services to the deaf in District XI, incorporating the minimum standards described above: sign language ability and sufficient knowledge and understanding of the deaf community.

## II. ANALYSIS

### A. CLASS CERTIFICATION

As a preliminary matter, the Court notes that although the case is brought on behalf of the three named plaintiffs "and all others similarly situated," the Plaintiffs have not yet moved for class certification. Federal Rule of Civil Procedure 23(c)(1)[2] requires

that the Court make such a determination at the earliest opportunity. The Court has an independent obligation to decide whether an action was properly brought as a class action, where neither party moves for a ruling on class certification. *Gore v. Turner,* 563 F.2d 159, 165 (5th Cir.1977)[3]; *Rodriquez v. East Texas Motor Freight,* 505 F.2d 40, 50 (5th Cir.1974), *vacated on other grounds,* 431 U.S. 395, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977).

In their Complaint, the Plaintiffs identify the class as "all deaf/hearing impaired individuals and family members of deaf/hearing impaired individuals, who reside in the Dade and Monroe areas and who presently receive or will be in need of mental health counseling services." (Compl., at par. 12).

The Court finds that the evidence presented at the hearing satisfies the requirements of a class action. The Plaintiffs have shown that (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class. Fed.R.Civ.P. 23(a).

### B. INJUNCTIVE RELIEF STANDARD

The test for injunctive relief is set forth in *Haitian Refugee Center, Inc. v. Nelson,* 872 F.2d 1555 (11th Cir.1989). That test requires the Plaintiffs to prove: (1) a substantial likelihood of success on the merits; (2) that the Plaintiffs will suffer irreparable injury if the injunction is not issued; (3) that the threatened injury to the Plaintiffs outweighs the potential harm to the Defendants; and (4) that the injunction, if issued, would not be adverse to the public interest. *Haitian Refugee Center,* 872 F.2d at 1561–62.

---

2. Fed.R.Civ.P. 23(c)(1) states:
    (c) Determination by Order Whether Class Action to be Maintained; Notice, Judgment; Actions Conducted Partially as Class Actions.
    (1) As soon as practicable after the commencement of an action brought as a class action, the court shall determine by order whether it is to be so maintained. An order under this subdivision

may be conditional or may be altered or amended before the decision on the merits.

3. In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the 11th Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

### 1. Substantial Likelihood of Success

■ The issue of whether the Plaintiffs have demonstrated a substantial likelihood of success on the merits depends upon whether the Plaintiffs have offered sufficient evidence to show that the Defendants' actions violate the ADA and/or the Rehabilitation Act of 1973.[4] The Plaintiffs assert their claims under Title II of the ADA, which prohibits discrimination against persons with disabilities by public entities.[5] 42 U.S.C. § 12132. That section states, in pertinent part:

> ... [N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by such entity.

42 U.S.C. § 12132. Title II's definition of "public entity" includes "any department, agency, special purpose district, or other instrumentality of a State or States or local government." 42 U.S.C. § 12131(1)(B). Thus, HRS is a public entity because it is a Department of state government.

■ The ADA defines "qualified individual with a disability" as "an individual with a disability who, with or without reasonable modifications" is otherwise eligible to receive the government services in question. 42 U.S.C. § 12131(2). A "disability" is "a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual ..." 42 U.S.C. § 12102; 28 C.F.R. § 35.104. The phrase "major life ac-

tivities" is defined by the ADA regulations to include "hearing" and "speaking." 28 C.F.R. § 35.104(2).[6]

This action is brought on behalf of deaf and hearing impaired individuals, thus the Plaintiffs meet the definition of being disabled. HRS District XI provides mental health counseling to any resident of Dade and Monroe counties who seeks help through a network of contracting agencies. The Plaintiffs are residents of Dade and Monroe counties, thus they are "qualified individual[s] with a disability" as defined by the ADA, because they are eligible to receive mental health counseling from HRS, and mental health counseling is a governmental benefit offered to the general population. 42 U.S.C. § 12131(2).

■ Thus, to determine whether the Plaintiffs have demonstrated a substantial likelihood of success on the merits, the Plaintiffs must show that the Defendants denied the Plaintiffs, by reason of their disability, the benefits of mental health services the Defendants provide to the public. *See* 42 U.S.C. § 12132.

The ADA regulations lay out the steps a public entity must take to ensure that it does not exclude persons with disabilities from enjoying the same benefits afforded to the general population. The regulations state, in pertinent part:

> (b)(1) A public entity, in providing any aid, benefit or service, may not, directly, *or*

---

4. The Rehabilitation Act of 1973 prohibits disability discrimination by any public entity receiving federal financial assistance. Congress noted that the purpose of Title II of the ADA is to "make applicable the prohibitions against discrimination on the basis of disability currently set out in regulations implementing Section 504 of the Rehabilitation Act of 1973 to all programs, activities and services provided or made available by state and local governments or instrumentalities or agencies thereto, regardless of whether or not such entities received federal financial assistance." Sen.Rep. No. 116, 101st Cong., 1st Sess. 44 (1989). Based upon the close relationship between the two acts, cases interpreting the Rehabilitation Act are considered persuasive authority for interpreting the ADA. *See Easley by Easley v. Snider,* 841 F.Supp. 668 (E.D.Pa.1993); *Martin v. Voinovich,* 840 F.Supp. 1175, 1192 (S.D.Ohio 1993). Accordingly, this Order addresses only the Plaintiffs' ADA claims.

5. Title I of the ADA prohibits employment discrimination on the basis of disability by any employer of more than 15 employees. 42 U.S.C. Sec. 12111–12117. Title III of the ADA prohibits public accommodations, including hotels, restaurants and retail stores, from denying persons with disabilities equal access to their services. 42 U.S.C. Sec. 12181–12201.

6. Because Congress explicitly authorized the Attorney General to promulgate regulations under the ADA, *see* 42 U.S.C. § 12134(a), the Court must give these regulations "legislative and hence controlling weight unless they are arbitrary, capricious, or plainly contrary to the statute." *United States v. Morton,* 467 U.S. 822, 834, 104 S.Ct. 2769, 2776, 81 L.Ed.2d 680 (1984) (citations omitted).

*through contractual, licensing,* or other arrangements, on the basis of disability— (i) Deny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit or service; (ii) *Afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit or services that is not equal to that afforded others;* (iii) Provide a qualified individual with a disability with an aid, benefit, or service that is *not as affective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided others.*

28 C.F.R. § 35.130(b)(1)(i–iii) (emphasis added). The Plaintiffs argue that HRS's intention to provide mental health services to the deaf through an interpreter does not provide them with services that are "equal" to those afforded the non-disabled population. The Plaintiffs contend that the presence of an interpreter in a therapeutic setting deprives them of an equal opportunity to achieve the same results as a hearing individual.

Twyla Lightowler ("Lightowler"), a sign language interpreter employed by the DSB, testified that based upon her experience, the presence of an interpreter greatly inhibits the effectiveness of mental health counseling. She stated that she has interpreted for hearing counselors working with deaf or hearing-impaired clients on countless occasions. Lightowler testified that effective therapy demands accurate communication between therapist and patient. American Sign Language ("ASL"), the most commonly used sign language, by its very nature does not lend itself to word-for-word translation into spoken English. ASL's grammar, syntax and word order differ from English and combine to form an independent language. *See Petersen v. Hastings Public Schools,* 831 F.Supp. 742 (D.Neb.1993).

Because ASL is, by its nature, a more abstract language, the chance of miscommunication between the therapist and client is much greater when an interpreter is used,

Lightowler testified. This risk is compounded by the likelihood that a therapist will use different interpreters for each therapeutic session. A lack of continuity increases the chance that an interpreter new to a therapist-client pair will fail to grasp the true meaning of what the parties are trying to convey, Lightowler testified. For example, Lightowler said there is no specific sign in ASL for the word "hallucination." In order to convey this concept to a deaf client, an interpreter would have to actually convey the experience of a hallucination. Two different interpreters might approach this task in completely different ways, leaving the deaf client confused as to what the therapist is inquiring, Lightowler testified.

The small number of sign language interpreters in Dade and Monroe counties [7] also diminishes the effectiveness of counseling because it is likely that an interpreter working in a mental health setting will later be called upon to translate for the deaf client under completely different circumstances, Lightowler testified. A deaf client's awareness that he may later encounter an interpreter with whom he has divulged personal information may make the deaf client less inclined to reveal such information to the therapist.

Plaintiff Tugg stated that he had attempted to receive mental health counseling from a counselor who had a limited ability to communicate in basic sign language but found the process frustrating. As Tugg stated in his affidavit:

I have considered in the past, the option of using a qualified interpreter in my sessions with a hearing counselor, but I have rejected the idea as not be (sic) either feasible or appropriate. I am concerned about the ability of the interpreter to give the counselor a proper interpretation of the message I am trying to send. I believe it is important for a counselor to have direct one-on-one communication with a patient so that the counselor can obtain the cor-

---

7. Lightowler testified that there are nine nationally certified ASL interpreters in Dade and Monroe counties. There are also 10 additional interpreters who are qualified but not certified. (Lightowler Aff., at par. 6).

rect understanding of what I am trying to communicate.

(Tugg Aff., at p. 3).

Darlene Watson, a hearing-impaired counselor employed by the DSB, also testified that two of her deaf clients could not be served effectively by hearing counselors. Watson works with Christopher Patterson and his grandmother, Plaintiff Christine Ponder. Watson also counsels Jessica Carpenter and her mother, Plaintiff Jan Carpenter. Watson testified that because she is also hearing-impaired and has an understanding of the unique problems faced by the deaf, she is able to develop a bond of trust with her deaf clients. At the hearing she stated "I believe Chris Patterson accepted me with trust, he could be himself." Watson testified that because Patterson's first language was ASL, not English, it is extremely difficult to accurately translate what he is saying in a therapeutic setting. "It takes five years to be fluent in ASL. There is no written component for it. It has its own rules and instructions," Watson testified.

Ponder testified that she has seen a marked improvement in her grandson Christopher's behavior since he began attending counseling sessions at the DSB with Watson. Ponder stated that while Christopher remains in a special education class because of his past behavior problems, he has recently been reclassified by his school as emotionally disturbed instead of severely emotionally disturbed.

Carpenter testified that her daughter Jessica had received counseling from a hearing therapist through an interpreter in the past but it had not been effective. Carpenter testified that she believes that if Jessica is forced to obtain counseling again through an interpreter it is her opinion, based on past experience, that Jessica's behavior will deteriorate. Carpenter testified that her daughter's behavior had "changed dramatically" since she began receiving counseling from Watson. Jessica is no longer aggressive. The frequent calls Carpenter received from Jessica's elementary school reporting her for fighting and name-calling have stopped.

The Plaintiffs rely on a recent decision in this district setting forth the analysis a court must make to determine whether equivalent public services are being provided to persons with disabilities. In *Concerned Parents to Save Dreher Park Ctr. v. City of West Palm Beach,* 846 F.Supp. 986 (S.D.Fla.1994), a group of parents of disabled children sought an injunction to prevent the City of West Palm Beach from cutting all funding for special recreational programs the city had provided to persons with disabilities. The Defendant argued that it was not in violation of the ADA because all existing recreation programs would remain open to the disabled.

In granting the Plaintiffs' Motion for a Preliminary Injunction, Judge Kenneth L. Ryskamp found that "[w]hile it is true that there is no evidence of deliberate exclusion of disabled persons from the general recreational programs offered by the city, it is clear that *many of the general programs are unable to offer the benefits of recreation to individuals with disabilities because of the nature of the recreational activities and the physical and other limitations of persons with disabilities." Concerned Parents* at 991 (emphasis added).

The court in Concerned Parents found that the ADA does not require that persons with disabilities be given a specific type of recreational services, or any recreation services at all. "However, the ADA does require that persons with disabilities be given *equal* access to whatever benefits the City offers to persons without disabilities." *Concerned Parents* at 991, n. 11, citing *Alexander v. Choate,* 469 U.S. 287, 303, 105 S.Ct. 712, 721, 83 L.Ed.2d 661 (1985) (interpreting Section 504 of the Rehabilitation Act of 1973). The court further found that "although the City is permitted to *provide* recreational benefits that are better than those provided to nondisabled persons, see 28 C.F.R. § 35.130(c), the city is not required to do so." *Id.* (emphasis in original). Nevertheless, the court found that separate recreational programs did not confer special benefits to persons with disabilities but merely put them on equal footing with the general population.

The thrust of the Defendants argument against the entry of this injunction is that the relief sought by the Plaintiffs is a special

benefit that exceeds the services they provide to the general public. The Defendants raise two principal arguments against the Plaintiffs' likelihood of success.

■ First, the Defendants contend that Plaintiffs Ponder and Carpenter lack standing to bring the suit as named plaintiffs because they are not themselves disabled.

In Title II, Congress specifically granted an independent right of action to individuals who are not disabled but are discriminated against because of their known association with an person with a disability. The regulations state, in pertinent part:

(g) A public entity shall not exclude or otherwise deny equal services, programs, or activities to an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association.

28 C.F.R. § 35.130(g). The regulations give broad protection to anyone associated with an individual with a disability, not just those with a familial relationship. The Appendix to 28 C.F.R. § 35.130 states as follows:

Congress considered, and rejected, amendments that would have limited the scope of this provision to specific associations and relationships. Therefore, if a public entity refuses admission to a person with cerebral palsy and his or her companions, the companions have an independent right of action under the ADA and this section.

Plaintiffs Ponder and Carpenter contend that after June 30, 1994, they and all others similarly situated, will be denied the mental health services they need to help their deaf or hearing impaired dependents. This denial of services is based upon Ponder and Carpenter's association with their daughter and grandson who are deaf or hearing impaired. Consequently, the Court concludes that the Plaintiffs have demonstrated standing to sue the Defendants under the ADA.

Second, the Defendants argue that the Plaintiffs are not entitled to relief under the ADA because they base their claims on the alleged inability of hearing counselors to understand deaf culture. Culture is not a disability, according to the ADA regulations.

The United States Department of Justice's commentary on the regulation defining "physical or mental impairment" states:

Physical or mental impairment does not include simple physical characteristics, such as blue eyes or black hair. Nor does it include environmental, *cultural*, economic, or other disadvantages, such as having a prison record, or being poor.

ADA Handbook, p. II–19 (emphasis added).

The Plaintiffs do refer frequently to the unique nature of "deaf culture." The Plaintiffs argue that a hearing mental health counselor with no experience treating deaf clients would be unable to understand the daily frustrations the deaf endure. (Pl. Memo of Law in Sup. Mot. for Prel. Inj., at p. 7).

The Plaintiffs established that the interpreters offered by the Defendants fail to surmount the language barrier the Plaintiffs face in receiving effective mental health counseling. To the extent that this obstacle is heightened by a therapist's lack of education, training or experience regarding the specific psychological conditions common to the deaf, the Court finds this issue is rooted in the Plaintiffs condition, not their culture.

In sum, the Court finds that the Plaintiffs have presented sufficient evidence to demonstrate that the Defendants have denied the Plaintiffs, by reason of their disability, the benefits of mental health services provided by HRS to the general public. Thus, the Plaintiffs have shown a substantial likelihood of success on the merits.

In reaching this conclusion, the Court notes the absence of evidence offered by the Defendant to rebut the Plaintiffs' contentions. The Defendants offered no testimony from deaf HRS clients who had received services from a hearing counselor and a sign language interpreter. None of HRS's mental health care providers took the stand to describe any experience they had in providing mental health counseling to deaf clients and how they would use an interpreter to counsel their deaf clients effectively.

### 2. Irreparable Injury

■ The Plaintiffs contend that they will suffer immediate, irreparable injuries if the

injunction is not entered. These injuries include psychological stress which could lead to suicide among some Plaintiffs. (*See* Affidavits of Tugg at par. 7; Carpenter at par. 9, 10; Ponder at par. 6; Bail at par. 18; and Watson at par. 9).

In *Concerned Parents,* the court found that the recreational programs that the defendants sought to eliminate contributed to a sense of emotional and psychological well-being for the disabled individuals, and their absence would cause irreparable injury to disabled individuals. *See Concerned Parents,* at 992.

Courts have found irreparable injury based upon psychological injury or emotional distress in cases brought under Section 504 of the Rehabilitation Act of 1973. *See Chalk v. United States District Court Central District of California,* 840 F.2d 701, 710 (9th Cir.1988) (irreparable injury found to AIDS-infected teacher transferred from teaching position to writing grant proposals, because removal from classroom deprived him of a sense of well-being); *Ray v. School District of DeSoto County,* 666 F.Supp. 1524 (M.D.Fla.1987) (HIV-positive children suffered irreparable injury when they were excluded from school based upon the plaintiffs' feeling of anger, resentment and social rejection); *Crocker v. Tennessee Secondary School Athletic Ass'n,* 735 F.Supp. 753 (M.D.Tenn.1990), *aff'd without op.* 908 F.2d 972 (6th Cir.1990) (disabled plaintiff's exclusion from interscholastic athletics caused irreparable injury by denying plaintiff the satisfaction of competitive sports); *Callicotte v. Carlucci,* 698 F.Supp. 944 (D.D.C.1988) (disabled employee's removal from job would cause severe psychological harm).

Accordingly, the court finds that the Plaintiffs have established that they will suffer irreparable injury if the injunction is not entered.

### 3. Balance of Equities in Favor of Movant

The Defendants argue that the ADA permits them to provide mental health services through sign language interpreters because interpreters are considered "auxiliary aids" under the ADA. Under the heading "Communications," the ADA regulations state:

(a) A public entity shall take appropriate steps to ensure that communications with applicants, participants, and members of the public with disabilities are as effective as communications with others.

(b)(1) A public entity shall furnish appropriate auxiliary aids and services where necessary to afford an individual with a disability an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity conducted by a public entity.

28 C.F.R. § 35.160(a), (b)(1). The list of "auxiliary aids" includes "qualified interpreters." 28 C.F.R. § 35.104. Thus, the Defendants argue, they relied upon the ADA regulations to grant them the authority to provide mental health counseling for deaf clients through qualified interpreters.

The ADA regulations do not state that qualified interpreters, or any of the auxiliary aids listed, are an acceptable means of providing services to persons with disabilities under *all* circumstances. The regulation regarding communications states:

(2) In determining what type of auxiliary aid and service is necessary, *a public entity shall give primary consideration to the requests of the individual with disabilities.*

28 C.F.R. § 35.160(b)(2) (emphasis added). The Appendix to 28 C.F.R. § 35.160 states that "[t]he public entity shall honor the [disabled individual's] choice [of auxiliary aid] unless it can demonstrate another effective means of communications exists or that the use of the means chosen would not be required under § 35.164."

Section 35.164 also places a limit on the lengths a public entity must go to provide auxiliary aids. It states that a public entity is not required to take any action if "it can demonstrate [the action] would result in a fundamental alteration in the nature of a device, program or activity or [create] an undue financial and administrative burden." 28 C.F.R. § 35.164. Under those circumstances the public entity has the burden of demonstrating that providing the auxiliary aid of the disabled individual would create such a hardship. This determination must

be made by the head of the public entity, who must set forth in writing the reasons why the entity cannot comply with the wishes of the disabled individual, after considering all available resources. 28 C.F.R. § 35.164

At the hearing, the Court invited the Defendants to address the issue of the harm they will suffer if the injunction is entered. Specifically, the Court asked for a cost benefit analysis the Defendants had conducted concluding that (1) providing the Plaintiffs with mental health counselors who possessed sign language ability and experience working with the deaf was too expensive to fit within the HRS budget and (2) that HRS's chosen alternative of providing qualified interpreters would cost the Defendants less money or create a lesser burden.

The Defendants replied that no such cost benefit analysis had been conducted. The evidence produced at the hearing indicated that under HRS's intended plan, it will cost an HRS contracting mental health provider a minimum of $35 per hour to provide a sign language interpreter *in addition to* the cost of the mental health counselor. Without the benefit of any accurate figures, logic would indicate that it would cost less to employ one individual to perform two tasks (signing and counseling) than two individuals to perform those same tasks. Counsel for the Defendants disputed this at the hearing, stating that because the pool of individuals meeting these qualifications is so small [8] the cost of securing their services would be higher. The Defendants, however, did not produce evidence to support this argument. The Defendants also did not demonstrate that they had complied with the requirements of 28 C.F.R. § 35.164, which mandates that the public entity set forth its findings as to why it rejected the auxiliary aid sought by a disabled individual after considering all available resources.

The Court also does not find that the provision of mental health counselors with sign language ability and training in the needs of the deaf would create a "fundamental alteration" in the government service, as

prohibited by 28 C.F.R. § 35.164. The nature of the service is mental health counseling. The relief sought by the Plaintiffs simply sets forth specific qualifications for individuals providing that service and does not fundamentally alter the nature of the service provided.

The Defendants' claim that entry of an injunction would place an administrative burden upon them is also unavailing. The Defendants argued that HRS funding for mental health contractors is set for the next fiscal year, thus there is no way to provide funding for the services sought by the Plaintiffs without undergoing a significant budget reallocation. The Court finds that any additional administrative burden the Defendants suffer is a necessary consequence of any agency's compliance with the ADA law.

Defendant Anita Bock, HRS District Administrator for District XI, testified that she had not attended any training seminars on the ADA since its inception and was not aware of any training provided for employees of her agency. She testified that she oversees over 600 contracts with service providers in the District, and the District XI budget only allows for a single on-site inspection by HRS staff each year to ensure ADA compliance. Bock testified that HRS's policy is to simply ask its contractors if they comply with the ADA. If the contractor says yes, then HRS accepts their representation as true and makes no further inquiry. In her deposition, Bock testified that "most of our providers are not in compliance with the terms of the contracts. That's a fact of life." (Bock depo., at p. 25).

Sylvia Quintana, Program Supervisor for HRS for Alcohol, Drug Abuse and Mental Health Programs, testified at the hearing that her only experience with the ADA involved a two hour training session for approximately 18 members of her 30 person staff. However, despite this training, Quintana testified that HRS District XI has no ADA grievance procedures, as mandated by

---

**8.** The number of people in Dade and Monroe counties possessing these qualifications was estimated by the Plaintiffs as four, including David Killam and Darlene Watson of the DSB and Dr.

August Vanderbeek and Dr. Larry Schwartz, two hearing mental health counselors proficient in sign language.

28 C.F.R. § 35.107. That regulation states, in pertinent part:

> (b) Complaint procedure. A public entity that employs 50 or more persons shall adopt and publish grievance procedures providing for prompt and equitable resolution of complaints alleging any action that would be prohibited by this part.

28 C.F.R. § 35.107. By failing to comply with this ADA provision, the Defendants provided no avenue for the Plaintiffs to bring their grievance other than Federal Court.

Accordingly, the Court finds that the balance of equities in this matter weighs in the Plaintiffs' favor.

### 4. Public Interest

 In *Concerned Parents*, Judge Ryskamp weighed the City of West Palm Beach's interest in balancing its budget against the plaintiffs' interest in participating in recreational programs and found that the public interest was not harmed by continuing the funding in question. *See Concerned Parents* at 993. "[B]eyond the interest of the 300 plus disabled individuals that participate in programs offered by the City, the public also has an interest in meeting the recreation needs of people with disabilities." *Id.* Similarly, this Court also finds that the public has an interest in providing for the full participation by persons with disabilities in the mental health benefits afforded by the state.

## III. CONCLUSION

THE COURT has considered the Motion, the responses, the testimony of witnesses, and the pertinent portions of the record, and being otherwise fully advised in the premises, it is

ORDERED AND ADJUDGED that the Motion be, and the same is hereby GRANTED. It is further ORDERED AND ADJUDGED as follows:

The provision of mental health services for the deaf by HRS in District XI serving Dade and Monroe counties shall include, to the extent available in the community, mental health counselors, deaf or hearing, with sign language ability, who possess by training, education, or experience, an understanding of the mental health needs of the deaf commu-

nity. Compensation for such services shall be at a rate consistent with that established in the DSB's contract with HRS that is the subject of this action. HRS shall also devise guidelines or promulgate regulations for the provision of mental health services to the deaf, incorporating the minimum standards discussed above. This Order shall remain in effect until such guidelines or regulations are approved by this Court.

DONE AND ORDERED.