OPINION OF THE COURT
Michael L. Hanuszczak, J.
On November 14, 2000, respondent, a hearing-impaired child, was deemed placed in foster care within the meaning of Family Court Act § 355.5, and placed in the custody of the New York State Office of Children and Family Services (hereinafter OCFS) following a finding that the respondent had committed an act which if committed by an adult would constitute the crime of endangering the welfare of a child. The order of placement was entered for an initial term of one year expiring July 20, 2001, with credit for time spent in detention, pursuant to section 353.3 of the Family Court Act. On April 23, 2001, the petitioner timely filed a petition for a 12-month extension of placement, pursuant to Family Court Act § 355.3. Respondent’s Law Guardian opposes the extension of placement and seeks a modification of said placement on the grounds that the OCFS placement is not the least restrictive and fails to provide the respondent with the services he needs. The petition was initially heard on May 16, 2001, at which time a pretrial conference was scheduled for May 31, 2001. Since the parties were unable to reach agreement at the pretrial conference, a hearing date was scheduled. On July 5, 2001, the hearing as to the extension of the respondent’s placement commenced, but could not be completed that day. Pursuant to section 355.3 (5) of the *320 Family Court Act, placement was temporarily extended for 30 days. At the hearing, testimony was heard from Dr. Galina Ostromogolsky, OCFS psychologist, for the petitioner. For the respondent, testimony was heard from John Gaehring, clinical mentor at Hillside Children’s Center, Rochester, New York, and from Dr. Judith Grimes, a psychologist affiliated with Psychological Health Care, a privaté provider, who is also an independent provider of psychological evaluations. The court called the respondent’s parents to testify.
The hearing was continued on July 6th and was completed on August 2, 2001. At the completion of the hearing on August 2, 2001, respondent’s placement was extended an additional 15 days, pursuant to Family Court Act § 355.3 (5), in order to ensure continued placement while this decision and order was pending.
The issues raised by this petition to extend placement, and by respondent’s opposition thereto, are threefold. First, whether the respondent’s placement with OCFS is the least restrictive placement when the best interests of the respondent are balanced with the need to protect the community. Secondly, whether OCFS has violated the Americans With Disabilities Act (42 USC § 12101 et seq.) by allegedly denying the respondent, a hearing-impaired individual, the benefits of sexual offender treatment accorded hearing individuals. And lastly, has OCFS failed, as alleged by the respondent, to provide the respondent with special education services he allegedly needs.
The petitioner, OCFS, in support of its motion to extend placement, asserts that respondent’s need for sexual offender treatment, which led to his initial placement at OCFS’s Oatka Residential Center, is a continuing one, and that the facility is providing the respondent with treatment specific to that need. It is the position of the OCFS that the respondent is in need of at least seven to nine more months of said treatment in order to complete sexual offender treatment goals and objectives. OCFS further maintains that sufficient interpreter services are in place to accommodate the respondent’s special needs as he proceeds through this program. OCFS also advocates the continuation of placement with the agency, arguing that a less restrictive placement will pose a threat to the safety of the community.
Respondent argues that OCFS placement is not the least restrictive placement available. Secondly, respondent’s counsel asserts that continuation of respondent’s placement with OCFS violates the Americans With Disabilities Act, as OCFS is *321 “incapable of providing an appropriate, effective treatment program given [respondent’s] disability.” (Respondent’s letter mem at 2.) Lastly, the respondent claims that OCFS has failed to provide the special education services that were previously provided to the respondent by his former public school district, which are delineated in his individualized education program, a copy of which was provided to OCFS.
(1) Least Restrictive Placement
In determining whether a placement is the “least restrictive” available option, the court must examine whether the placement balances the needs and best interests of the respondent with the need to protect the community. (Matter of Sabrina S., 256 AD2d 914 [3d Dept 1998].) In this instance, the court disagrees with the respondent’s position that placement with OCFS is not the least restrictive alternative for placement. On November 14, 2000, this court determined, after balancing the needs and the best interests of the respondent as well as the need for protection of the community, that the least restrictive placement for this respondent was with the New York State Office of Children and Family Services, pursuant to Family Court Act § 352.2 (1), (2) (a). The respondent has offered no factual evidence here to suggest that there has been a change in circumstances that previously led this court to hold that Nicholas, an adjudicated juvenile delinquent, is in need of the type of treatment and placement offered by the Office of Children and Family Services. In contrast, evidence to support the necessity of respondent’s completion of the OCFS sex offender treatment program was presented at the hearing by petitioner, and this evidence supports this court’s finding that the respondent continues to be a risk to the community.
Currently, the respondent participates in a sexual offender treatment program that includes a behavior component in the respondent’s unit as well as a cognitive group that meets twice a week, which includes additional individual meetings with his psychologist to facilitate participation. An interpreter is provided in all treatment groups, as well as in individual counseling meetings. Every effort is made to insure that the same interpreter is available most of the time. In addition, the respondent has been under the care of a psychiatrist with whom he meets once every four to five weeks.
Petitioner’s exhibit No. 4, offered and received into evidence at the hearing, is a report prepared by Peter Leising, a psychiatric social worker, associated with the Children’s Psychiatric Center of Western New York. Mr. Leising was not called as a *322 witness by the petitioner. Instead, Dr. Galina Ostromogolsky, staff psychologist at Oatka, the residential treatment facility where the respondent is placed, testified that Mr. Leising is not a staff member of Oatka, but is instead part of a mobile mental health team that performs psychological assessments for Oatka. Upon referral from Oatka, the respondent was assessed by Mr. Leising. The referral was made after it was learned that the Law Guardian was opposed to his client’s placement with OCFS. In his report, Mr. Leising determined that the respondent is at a low to medium risk of sexual reoffending behavior. Respondent’s counsel emphasizes this finding to support his position that the respondent should be moved to a less restrictive placement. Respondent’s counsel further asserts that in fact, the evaluation supports his position that his client should be moved to a therapeutic foster care setting, because “any criteria that are scored as a moderate risk has to do with issues involving family or adult relationships.” (Respondent’s attorney letter mem at 2.)
The court notes, however, that although the respondent’s assessment resulted in an overall low to moderate risk of reoffense, the assessment lists its specific findings as well, pursuant to two tests administered by the evaluator. In contrast to respondent’s reading of this report, the court notes that the report clearly states that a moderate risk of sexual reoffending behavior existed on the grounds that the respondent’s sexual offending behavior occurred over a period greater than six months with one victim, and that there was a level of planning to his sexual offending behavior. Thus, the moderate risk identified is not confined just to the respondent’s interaction and relationships with family and adults. The court also finds disturbing the determination that the respondent has displayed a “minimal level of remorse or guilt” (petitioner’s exhibit No. 4), which again, resulted in a moderate level of risk for reoffense. Finally, the court notes that this assessment also categorizes the respondent as high risk in other areas. While this rating was made following the administration of an evaluating instrument that assesses reore-sexual criminogenic behavior, the court notes that this high risk rating is based upon the respondent’s conflicted relationships with both his adoptive parents, and upon his “callousness” toward his victim (his five-year-old adopted sister). (The report refers to the fact that the respondent used duct tape and physical coercion of his victim as “illustrative of his lack of emotional detachment [sic]” [petitioner’s exhibit No. 4 at 3]. The use of duct tape to subdue *323 the victim was revealed by the victim during counseling following the respondent’s adjudication; the respondent’s father also testified to this disturbing revelation at the hearing.) The respondent was also rated high risk for his “passive defiance of authority.” (Petitioner’s exhibit No. 4 at 2.)
This court is of the opinion that this respondent cannot simply be described as an individual who merely presents a low to moderate risk of reoffending. The court also cannot ignore the conclusion reached by the evaluator that this respondent, if placed in the custody of the Department of Social Services, must be placed in a “residential setting that can provide supervision, behavioral structure, and safety.” (Petitioner’s exhibit No. 4 at 3.)
The respondent seeks placement in the custody of the Onondaga County Department of Social Services (DSS) in order to enter a therapeutic foster care program that would be administered by the Hillside Children’s Center in Rochester, New York. There, according to the testimony of respondent’s witness, John Gaehring, the respondent would be placed in therapeutic foster home care, which he defined as a “signing” family. The respondent would then attend the Rochester School for the Deaf, and receive mental health services at an out-patient mental health facility. Mr. Gaehring testified that the intent of such a placement is to “learn and use positive family relationships (in order to) move on to young adulthood.” When asked to comment upon Mr. Leising’s report, petitioner’s exhibit No. 4, Mr. Gaehring noted that the respondent had been assessed as high risk by the evaluator in the area of conflicted relationships with his adoptive parents, and from his exposure to inconsistent parenting patterns. Mr. Gaehring testified that the need for a family setting/environment was primary, first in the “global sense” of learning how a family interacts, as well as on a secondary, specific level, as the respondent’s offense occurred within the family, and was, therefore, incest, rather than a sexual offense against a stranger. It was therefore the recommendation of Mr. Gaehring that this respondent needs to be in a family, rather than residential, setting.
Mr. Gaehring testified, however, that he could not judge the respondent’s risk of reoffending. He stated that he believed the evaluator’s assessment of the respondent’s callousness toward his victim was a “considerable risk.” On cross-examination, Mr. Gaehring testified that supervision at the foster home would be “24 hours a day, seven days a week.” When asked if the foster parents ever took a break, the witness stated that *324 “the agency provides respite foster care.” When asked about the provision of staff when the foster parents sleep, Mr. Gaehring testified that “any monitoring devices that would be necessary would be installed.” Finally, when asked directly how a family approach to sex offender treatment could be appropriate where there is an individual such as the respondent who has sexually molested a member of his family, the witness replied that this type of treatment is a very intensive approach which involves the whole family, as incest is a family issue. Mr. Gaehring stated further that, in the respondent’s case, it was “certainly very early” to begin that approach, but that this approach should “ultimately” be offered. However, when asked if this approach would be possible in a situation where the family (in which the incest occurred) does not willingly participate in this treatment modality, Mr. Gaehring agreed that that approach would not be possible.
Mr. Gaehring was also asked on cross-examination whether he was aware that the incidents of sexual offense took place over a period of five to six months, and that respondent was still in the process of disclosing the severity of the incident. Mr. Gaehring replied that he was not. When asked to reaffirm his position that the respondent should be transferred to a therapeutic foster home, the witness replied that that was not his recommendation. When asked to explain this rather surprising response, Mr. Gaehring stated that his recommendation would be that Oatka, Hillside, and the family do a complete assessment of the respondent’s needs, and then “move toward * * * therapeutic foster care.” Still later, Mr. Gaehring stated that he would advocate a plan of transition, and that he did not believe in “precipitously disrupting treatment for any child.”
The court notes that Dr. Galina Ostromogolsky, the Oatka psychologist, testified that the respondent is still in the first stage of treatment. According to Dr. Ostromogolsky, the respondent has not completed his disclosure to the family; because he has not, he is in the “very beginning of treatment.” He will require another seven to nine months of treatment in order to complete the juvenile sex offender program. Respondent’s own witness, Mr. Gaehring, testified that the sexual offense program at Oatka is “very good.” Finally, the court notes that there has been no contact, and, apparently, no attempts at contact with the respondent from his adoptive parents since December of 2000, except for some occasional letters. The parents of the respondent do not wish their child to return *325 home at this time. As both Mr. Gaehring and Dr. Ostromogolsky testified, the optimum treatment for this youngster would be founded upon the whole family’s involvement in therapy. Respondent’s family does not choose to participate in such treatment at this time. As noted above, the treatment option advocated by the respondent, and testified to by Mr. Gaehring, does involve a family-centered approach, which is not possible at this juncture. Further, the OCFS psychologist testified that the respondent has developed an inability to form attachments to other people. The court finds that to discontinue respondent’s sex offender treatment at OCFS with the psychologist the respondent has been working with since May, and to place him in a different facility, could potentially exacerbate the respondent’s alleged inability to form attachments and sever the therapeutic relationship currently formed with his present psychologist.
The respondent questions the alleged failure of OCFS to investigate and/or to secure other, less restrictive placement. Dr. Ostromogolsky testified, however, that OCFS did investigate Hillside Children’s Center. This site was rejected, however, because Hillside’s only residential placement was operated by the Office of Mental Health. As the respondent has not been determined to present such mental health issues that would substantiate such placement, Hillside could not take him for residential placement. OCFS maintains that residential placement is necessary in order for the respondent to receive the type of close supervision he needs. The court agrees that placement of the respondent with DSS in a nonresidential program would not provide this level of supervision.
Therefore, the court finds that the respondent’s placement with OCFS remains the least restrictive alternative available in order to provide the respondent with the treatment he needs and to protect the community, in accordance with the court’s mandate under Family Court Act § 352.2 (2) (a).
(2) Effective and Equal Treatment
Respondent’s counsel also asserts in his letter memorandum that OCFS is “incapable of providing an appropriate, effective treatment program given [respondent’s] disability.” The respondent argues that placement with OCFS denies him “effective and equal” treatment due to an alleged failure of OCFS to provide the respondent with a counselor fluent in American Sign Language (hereinafter ASL).
The respondent refers this court to title II of the Americans With Disabilities Act (hereinafter ADA), which mandates that: *326 “no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.” (42 USC § 12132.)
Title II defines a “public entity” as “any department, agency, special purpose district, or other instrumentality of a State or States or local government.” (42 USC § 12131 [1] [B].) Therefore, OCFS is a public entity for purposes of the ADA as OCFS is an agency of the State of New York, created by statute, and operating thereunder. (Executive Law § 500 et seq.)
The phrase “qualified individual with a disability” is defined by title II as “an individual with a disability who, with or without reasonable modifications to rules, policies, or practices” is otherwise eligible to receive the government services in question. (42 USC § 12131 [2].) “Disability” is defined as a “physical or mental impairment that substantially limits one or more of the major life activities of [an] individual.” (42 USC § 12102 [2] [A].) “Major life activities” is defined by regulations governing the ADA to include an individual’s ability to hear. (28 CFR 35.104 [2].)
Respondent is a hearing-impaired child, and he is therefore disabled for purposes of the ADA.
The ADA prohibits a public entity from excluding persons with disabilities from enjoying the same benefits afforded to the general population. Under the ADA, a public entity, in providing any aid, benefit, or service, may not directly commit the following:
“(i) Deny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service;
“(ii) Afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others;
“(iii) Provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others.” (28 CFR 35.130 [b] [1] [i]-[iii].)
As OCFS is a public entity, and the respondent is a qualified individual with a disability, the issue then becomes whether the respondent is being denied the benefit of a service by rea *327 son of his disability. (See, Clarkson v Coughlin, 898 F Supp 1019, 1037 [SD NY 1995].)
Respondent answers in the affirmative, citing Tugg v Towey (864 F Supp 1201, 1211 [SD Fla 1994]), which held that the Florida Department of Health was in violation of the ADA as that agency denied individuals who are deaf and hearing impaired the benefits of mental health services such that are equal to those provided to the hearing public. The plaintiffs in Tugg argued that the “presence of an interpreter in a therapeutic setting deprive [d] them of an equal opportunity to achieve the same results as a hearing individual.” (Tugg, 864 F Supp at 1206.) The District Court of Florida agreed, and ordered the mental health department to provide mental health counselors with sign language ability who possess an understanding of the mental health needs of the deaf community, to the plaintiffs and those similarly situated. (Tugg, 864 F Supp at 1211.)
Unlike Tugg, however, in this case, insufficient evidence was presented by the respondent to support the allegation that he does not benefit “equally” from the counseling provided by OCFS in the same manner as hearing children do. Instead, the testimony and evidence adduced at the hearing indicates that the respondent is capable of reading lips, and understands, and can use ASL. The respondent’s psychologist at OCFS testified that the respondent is provided with a sign language interpreter while attending classes at the limited secure facility at which he is currently placed. Interestingly, there was testimony that from the age of 8 to 15, the respondent was mainstreamed in his former public school. The respondent’s father testified, for example, that while residing with his parents the respondent requested to continue attending a summer day camp even after it was converted to a mainstream camp, and that the respondent refused to use ASL and asked his parents not to use ASL to communicate with him. The respondent utilizes hearing aids in both ears and comprehends adequately through his ability to read lips according to his psychologist. A progress and adjustment report completed by OCFS on April 1, 2001 and introduced into evidence, as well as testimony at the hearing, reveals that the respondent has excelled in his education both prior to his offense and following his placement with OCFS. The respondent’s parents also testified that upon respondent’s placement in a mainstream school, the respondent made friends with the other children and disassociated himself from his deaf friends. Given the respondent’s academic success when he is mainstreamed and his academic *328 progress at Oatka, the court is not persuaded that the respondent is not receiving “effective” and “equal” treatment as a result of the absence of a therapist fluent in ASL. There is every indication that the respondent can understand most, if not all, that is being communicated to him, and that where it is suspected he has not fully comprehended, the staff is sensitive to the need to ensure comprehension.
Respondent also argues that spoken English cannot be translated word-for-word due to the nature of ASL. Thus, respondent argues that comprehension may be lost through the use of an interpreter to translate. However, the respondent has not presented sufficient evidence that this language barrier affects the counseling of hearing-impaired individuals in general, or more specifically the respondent. The respondent is provided with an ASL interpreter in every class and he has done very well academically, as is evidenced by his academic record since his placement with OCFS. The same ASL interpreter also translates during the respondent’s therapy sessions, and therefore, without proof to the contrary, the court finds that he understands his therapist as well as his academic teachers.
The respondent further asserts that the interpreter’s presence in counseling forms an alleged obstacle to the “equal” and “effective” treatment for the respondent. The respondent maintains that the presence of a third person must necessarily impede the development of a confidential, trusting, therapeutic relationship. Once again, the respondent did not submit any evidence to support this assertion. Instead, the respondent’s psychologist testified to the continuous utilization of the same interpreter during both the respondent’s group and individual treatment sessions. The psychologist also testified that she was attempting to integrate the interpreter as an active participant in the group therapy sessions in which the respondent participates.
The court finds that the respondent did not present sufficient evidence of the denial of benefits of the services provided to him at OCFS, by reason of his disability, such as would support his allegations of an ADA violation.
(3) Individualized Education Program
Notwithstanding the court’s prior finding that the respondent has not proven his allegations that the respondent’s current placement with OCFS violates the ADA, the court does find that the absence of special education services as outlined in the respondent’s individualized education program (hereinafter IEP) may result in the respondent not receiving the ser *329 vices he requires. The IEP completed by the respondent’s former public school district and entered into evidence sets forth the respondent’s test results and the services that were recommended to address his needs. The IEP recommended speech language therapy and a teacher of the deaf, both of which were provided to the respondent by his prior school district. In January of 2001 the OCFS Committee on Special Education met to review and draft another IEP report for the respondent. This IEP (the most recent), which was entered into evidence, omits the services of a speech language therapist and a teacher of the deaf as outlined in respondent’s previous IEP. In addition, the respondent’s present psychologist testified that the respondent is in fact not receiving the services of a speech language therapist or a teacher of the deaf while in OCFS custody. It is unknown as to why the respondent no longer receives these services, as he remains hearing impaired. The petitioner’s own witness, Dr. Ostromogolsky, testified that the respondent should be receiving speech therapy. As she also indicated that her expertise did not lie in the academic realm, such that she could not make a recommendation regarding the need for a teacher of the deaf, it would certainly appear that, at the very least, a re-evaluation in this regard should be made as well.
The court, therefore, directs OCFS, pursuant to Family Court Act § 255 (Matter of John M., 75 Misc 2d 672 [Fam Ct, Kings County 1973]), to have the respondent evaluated by qualified personnel with regard to his continuing need, if any, for a speech language therapist and a teacher of the deaf. This evaluation should be made in light of, and shall refer to, the earlier IEP from the Jamesville-DeWitt School District in reaching its conclusions. A detailed explanation of the decision not to provide these services shall be included in said report. Upon completion of this evaluation, OCFS is directed to submit the evaluation and an educational service plan based thereon to the court within 60 days of the entry of this decision. OCFS is further directed, to follow any and all recommendations made by the evaluators, pursuant to Education Law § 4005 (1) (c) (ii).
In conclusion, the court finds that OCFS has proven by a preponderance of the evidence that extending placement with OCFS is warranted, in light of the best interests of the respondent and those of society. (See, Matter of Sabrina S., 256 AD2d 914 [3d Dept 1998].)
The court further finds that, consistent with the need for the protection of the community, it is not appropriate at this time *330 for the respondent to return home, and, therefore, OCFS was not required to make reasonable efforts in that regard. (Family Ct Act § 355.3 [4] [i].) Respondent’s parents do not desire the respondent to return to their home, and they have not visited the respondent at the OCFS limited secure facility at which he has been placed since November 2000. Moreover, the victim still resides in her parents’ home, and reasonable efforts to return the respondent at this time would be inappropriate. The respondent is currently enrolled in therapeutic treatment which has as its goal his return to the community when same becomes appropriate. The court permitted OCFS to amend the respondent’s permanency goal set forth in its petition in open court to reflect that the respondent’s goal should more properly be that of independent living, and this court hereby approves the amended permanency plan.
It is hereby ordered that the respondent’s placement with the New York State Office of Children and Family Services is hereby extended for an additional period of 12 months, from July 20, 2001 to July 20, 2002. In the event that placement with the authorized agency is discontinued, the Office of Children and Family Services shall notify the court, the Presentment Agency, Law Guardian, and parent or other person responsible for the respondent’s care, of the reason for discontinuing placement with the authorized agency and the level and location of the respondent’s placement; and it is further ordered that the permanency plan for the respondent is hereby approved, and that reasonable efforts be made to implement said plan; and it is further ordered that the petitioner shall provide the parents of the respondent with visitation as follows: visitation at the facility on Saturdays and Sundays from 1:30 p.m. to 3:30 p.m., telephone calls and conference; and it is further ordered that service of this order upon the parties by regular first-class mail shall be deemed sufficient service.