AMERICAN ASSOCIATION OF PEOPLE WITH DISABILITIES; Daniel W. O'Connor; Kent Bell; and Beth Bowen, Plaintiffs, on behalf of themselves and others similarly situated,

v.

Glenda E. HOOD, as Secretary of State for the State of Florida; Edward C. Kast, as Director, Division of Elections; John Stafford, as Supervisor of Elections in Duval County, Florida, Defendants.

No. 3:01CV1275J.

United States District Court,
M.D. Florida.
Jacksonville Division.

March 24, 2004.

---

**21.** TR. 271, 275.

**22.** TR. 37, 131.

James Douglas Baldridge, Esq., Howrey, Simon, Arnold & White, LLP, Washington, DC.

Alan M. Wiseman, Esq., Howrey, Simon, Arnold & White, LLP, Washington, DC.

Danielle R. Oddo, Esq., Howrey, Simon, Arnold & White, LLP, Washington, DC.

Vincent E. Verrocchio, Esq., Howrey, Simon, Arnold & White, LLP, Washington, DC.

Ari N. Rothman, Esq., Howrey, Simon, Arnold & White, LLP, Washington, DC.

Lois G. Williams, Esq., Washington Lawwers Committee for Civil Rights & Urban Affairs, Washington, DC.

Elizabeth Elaine Gardner, Esq., Lawyers' Committee for Civil Rights and Urban Affairs, Washington, DC.

Tracey I. Arpen Jr., Esq., General Counsel's Office, City of Jacksonville, Jacksonville.

Scott D. Makar, Esq., General Counsel's Office, City of Jacksonville, Jacksonville.

Jason R. Teal, Esq., General Counsel's Office, City of Jacksonville, Jacksonville.

Ernst D. Mueller, Esq., General Counsel's Office, City of Jacksonville, Jacksonville.

George Lee Waas, Esq., Attorney General's Office, Dept. of Legal Affairs, Tallahassee.

### *ORDER*

ALLEY, District Judge.

This cause came on for trial before the Court, sitting without a jury, from September 23, 2003, through October 1, 2003. After considering the testimony of the witnesses, the documentary evidence submitted, the arguments of counsel, and the applicable authorities, the Court finds as follows:

### I. Findings of Fact

1. Plaintiffs Daniel O'Connor and Beth Bowen are visually impaired voters registered to vote in Duval County. *See* Dkt. 166, p. 51–52; Dkt. 167, p. 12–13. O'Connor has been legally blind since 1991 and Bowen has been blind since birth. *See id.*

2. Plaintiff Kent Bell is a manually impaired person registered to vote in Duval County. *See* Dkt. 166, p. 84. Bell was born without arms or legs (a condition known as congenital quadrahyteamelia). *See id.*

3. Plaintiff American Association of People with Disabilities (AAPD) is a national, cross disability membership organization. *See* Dkt. 170, p. 135–36. O'Connor, Bell, and Bowen are members of the AAPD. *See* Dkt. 166, p. 51, 83–84; Dkt. 167, p. 12.

4. Without third-party assistance, O'Connor, Bowen, and Bell are unable to vote using the optical scan voting system purchased by Duval County, Florida, in 2002. *See* Dkt. 166, p. 53, 84–85; Dkt. 167, p. 14. The individual Plaintiffs have voted in previous elections in Duval County with third-party assistance. *See* Dkt. 166, p. 52, 84–85; Dkt. 167, p. 13–14.

5. All three individual Plaintiffs have expressed concerns about voting with third-party assistance. *See* Dkt. 166, p. 58–61, 96–102; Dkt. 167, p. 16–20, 40. O'Connor has had to wait for poll workers to become available and has wondered whether his vote has been cast according to his wishes. *See* Dkt. 166, p. 60–61. In addition, O'Connor stated he cannot be sure the person providing assistance will read the entire ballot to him. *See id.* at 61. O'Connor testified that on one occasion the person providing assistance did not initially read the candidates' party affiliations, although she did so upon his request. *See id.* at 61, 70. O'Connor also testified about being provided assistance in a room where other disabled voters were being provided assistance and how he

could overhear other disabled voters' selections. *See id.* at 58–60.

6. Bell has had to wait for poll workers to become available to assist him and has had to vote in an open area where others may have been able to overhear his selections. *See id.* at 96–99.

7. Bowen has had to wait for assistance and expressed concerns about having to have a third party fill out her ballot. *See* Dkt. 167, p. 16, 40. In addition, Bowen testified that she has had to vote in the middle of a large, public room such that others may have overheard her selections. *See id.* at 16–20.

8. Plaintiffs have requested that Duval County provide voting systems that allow them to vote without assistance. *See* Dkt. 166, p. 63–64, 102, 105–06; Dkt. 167, p. 25–26.

9. Defendant Glenda Hood is the Florida Secretary of State and has overall responsibility for the administration of the state's election laws. *See* Dkt. 117, § IX, ¶ 8; Fla. Stat. § 15.13.

10. Before a Florida county may legally purchase a voting system, the voting system must be certified by the Division of Elections (DOE) of the Florida Department of State. *See* Dkt. 168, p. 14; Fla. Stat. § 101.294(1). Defendant Edward Kast is the Director of the DOE. *See* Dkt. 117, § IX, ¶ 9.

11. Certification is an application and licensing process that determines if a voting system meets the requirements of the Florida Election Code and the Florida Voting System Standards. *See* Dkt. 168, p. 10–11. A certified voting system has been tested to the highest standards of accuracy and reliability and can be relied upon to be dependable and to be a fairly good investment in terms of durability. *See* Dkt. 168, p. 15, 20; Plaintiffs' Exhibit 142.

12. Nothing prevents a county, a private organization, or an individual from seeking certification of a particular voting system. *See* Dkt. 168, p. 22–23; Fla. Stat. § 101.5605(2)(a). Nevertheless, absent a vendor's cooperation, it is unlikely that a county, a private organization, or an individual would be able to provide the technical data required during the certification process. *See* Dkt. 168, p. 113.

13. Nothing prevents the DOE from requesting proposals for a particular voting system. *See* Dkt. 168, p. 23–25.

14. During the 2000 presidential election, Duval County used a punch card voting system. *See* Dkt. 170, p. 44–46. Following the 2000 presidential election, Florida enacted legislation prohibiting the use of punch card voting systems after September 1, 2002. *See* Fla. Laws. ch.2001–40, § 18.

15. In September 2001, former Florida Secretary of State Katherine Harris sent a memorandum to county supervisors of elections encouraging the purchase of voting systems that are accessible to disabled voters. *See* Dkt. 169, p. 78–79; Plaintiffs' Exhibit 53. Recognizing that, at the time, only one certified voting system included an audio ballot option, she urged counties to include in purchase contracts a requirement that accessible technologies be provided prior to the September 2002 election. *See* Plaintiffs' Exhibit 53.

16. On August 16, 2001, the DOE certified an Elections Systems and Software, Inc. (ES & S), voting system that included optical scan machines for absentee or precinct voting and touch screen machines with audio ballot capability. *See* Dkt. 168, p. 29–30, 32–33; Plaintiffs' Exhibit 132. Additionally, the DOE certified the following ES & S voting systems with audio ballot capabilities:

- The ES & S Release 3, certified May 7, 2002. *See* Dkt. 168, p. 33–34; Plaintiffs' Exhibit 47.
- The ES & S Revised Release 3.1, certified June 17, 2002. *See* Dkt. 168, p. 35; Plaintiffs' Exhibit 68.
- The ES & S Release 4, certified August 7, 2002. *See* Dkt. 68, p. 37–38; Plaintiffs' Exhibit 63.
- The ES & S Release 3.2, certified August 21, 2002. *See* Dkt. 168, p. 38; Plaintiffs' Exhibit 64.
- The ES & S Release 4.2, certified August 21, 2002. *See* Dkt. 168, p. 38–39; Plaintiffs' Exhibit 65.

17. On January 22, 2001, Hart Inter-Civic (Hart) presented its eSlate voting system for certification. *See* Dkt. 168, p. 56. The DOE deemed Hart's application complete on September 17, 2001. *See* Dkt. 168, p. 56, 58. The application included documentation regarding Hart's disabled access unit indicating that it would permit navigation of both audio and video ballots using accessible switches (also known as jelly-switches). *See id.* at 56–57, 58–59. This system failed Phase II testing, specifically the Precinct Count System Software and the Central Count System Software Florida Qualification Tests. *See* Dkt. 169, p. 18–21; State Defendants' Exhibit 1, p. 67–68. The former test requires each precinct tabulator to process at least 9,900 ballots. *See id.* The latter test requires each central count system to process at least 192,000 ballots. *See id.* Following the voting systems failure to satisfy these tests, Hart withdrew its application for certification. *See* Dkt. 169, p. 23.

18. On August 7, 2002, the DOE certified a Sequoia Voting Systems, Inc. (Sequoia), voting system, the AVC Edge Voting System, Release Level 3, which included audio ballot capabilities. *See* Dkt. 168, p. 36; Plaintiffs' Exhibit 49.

19. The ES & S and Hart InterCivic touch screen voting systems can be operated by some manually impaired voters, including Bell, through the use of a mouth stick. *See* Dkt. 166, p. 86, 95; Dkt. 168, p. 145–46. A mouth stick would not have to be certified because mouth sticks are available to the general public. *See* Dkt. 168, p. 69. Thus, manually impaired voters may vote with a mouth stick on an ES & S or Hart InterCivic touch screen machine if they are able. *See* Dkt. 166, p. 86, 95; Dkt. 168, p. 69, 145–46.

20. In January 2002, Defendant John Stafford, Supervisor of Elections in Duval County, made the final decision to purchase the Global Election Systems (Global)[1] Accu Vote optical scan voting system. *See* Dkt. 169, p. 71; Dkt. 170, p. 8, 68–69. On January 24, 2002, the City of Jacksonville (City) awarded money for the purchase of the Accu Vote system. *See* Dkt. 170, p. 80; Stafford's Exhibit 6A. The City received 315 optical scan machines from April through June 2002. *See* Dkt. 169, p. 101–02; Stafford's Exhibit 9A, p. A–1, D–2. On October 3, 2002, the City signed an agreement (Agreement) with Diebold Election Systems, Inc. (Diebold). *See* Dkt. 169, p. 102.

21. The Agreement provided that the City would purchase the Accu Vote optical scan voting system for $1,813,600.00. *See* Dkt. 169, p. 102–03; Stafford's Exhibit 9A. The Agreement also permits the City to trade in the optical scan system machines before 2007 for credit toward the purchase of touch screen machines. *See* Dkt. 169, p. 108.

---

1. Diebold Election Systems, Inc., purchased Global in or around February 2002. *See* Dkt. 170, p. 37.

22. The City received $1,005,000 from the State of Florida for the purchase of this new voting equipment. *See* Dkt. 169, p. 103.

23. In addition to the optical scan machines, the City received three touch screen machines with audio ballot capabilities, which Stafford planned to locate at the Supervisor of Elections' office in downtown Jacksonville for use by visually impaired voters. *See* Dkt. 169, p. 160–61. The Agreement required Diebold to have the touch screen machines with audio ballot capabilities certified prior to the September 2002 election. *See* Dkt. 169, p. 108–09. Said touch screen machines were not certified prior to the September 2002 election and remain uncertified. *See* Dkt. 169, p. 109, 160–61.

24. The only voting system that enabled visually impaired voters to vote without assistance, that was certified early enough to allow Duval County to adopt the system after certification, but in time for the September 2002 election, was the ES & S voting system with audio ballot capabilities. *See* Dkt. 170, p. 73.

25. All three individual Plaintiffs' polling places are located near their homes. *See* Dkt. 166, p. 62, 101; Dkt. 167, p. 22. To travel to the Supervisor of Elections office in downtown Jacksonville via paratransit services could take four to five hours. *See* Dkt. 167, p. 22–23.

26. Stafford selected optical scan technology over touch screen technology because he felt it was easier to vote on optical scan machines; it was easier to train poll workers to use optical scan machines; it was easier to recount ballots cast on an optical scan machine; and optical scan systems had a proven track record. *See* Dkt. 169, p. 92; Dkt. 170, p. 66, 72.

27. Stafford elected not to purchase the ES & S touch screen voting system with audio ballot capabilities because a poll worker had to insert a cartridge into each machine to "boot up" the machine at the beginning of the day and to "download" the machine at the end of the day. *See* Dkt. 169, p. 138, 140; Dkt. 170, p. 75–76. Stafford believed that it was more appropriate for a technician rather than a poll worker to perform this function. *See* Dkt. 170, p. 76. While more than one cartridge can be purchased for each polling place to speed up this process, the information on the various cartridges must eventually be merged. *See id.* at 75–76.

28. Around April 2001, the estimated cost of touch screen systems for 250 voting precincts (as opposed to the 285 voting precincts currently used in Duval County) was $5,844,000 for the ES & S system; $7,012,800 for the Sequoia system; and $7,597,200 for the Diebold system. *See* Dkt. 170, p. 27, 120–121; Plaintiffs' Exhibit 100. The estimated annual maintenance costs of touch screen systems were $107,140 for the ES & S system; $97,400 for the Sequoia system; and $155,840 for the Diebold system. *See* Dkt. 170, p. 121; Plaintiffs' Exhibit 100. The estimated annual maintenance cost of the Diebold optical scan system was $45,000. *See* Plaintiffs' Exhibit 100.

29. At the time of trial, Stafford estimated that it would cost between twelve and thirteen million dollars to replace the optical scan system with a touch screen system. *See* Dkt. 170, p. 98.

30. Stafford did not investigate the cost of putting one touch screen machine in each precinct (as opposed to a voting system comprised entirely of touch screen machines). *See* Dkt. 170, p. 25–26. He currently estimates that it would cost between $1 million and $1.5 million to do so. *See id.* at 26.

31. The City of Jacksonville's fiscal year 2002–2003 budget exceeds $1.2 billion. *See* Dkt. 170, p. 30–31; Plaintiffs' Exhibit 139.

32. On September 5, 2001, Diebold applied for certification of its Accu Vote ES2001B+ touch screen voting system with audio ballot capabilities. *See* State Defendants' Exhibit 4, p. 21. The DOE identified several changes it wanted, including more detailed audio prompts and having the voter's final review of the ballot proceed from the top of the ballot to the bottom (as opposed to from the bottom of the ballot to the top). *See* Dkt. 171, p. 82–85. On May 9, 2002, Diebold withdrew the application prior to having effected these changes. *See id.* at 88–89; State Defendants' Exhibit 4, p. 21–22.

33. On June 12, 2002, Diebold applied for certification of its Accu Vote ES2001B V1 touch screen voting system with audio ballot capabilities. *See* Dkt. 168, p. 130–31; State Defendants' Exhibit 4, p. 33. The DOE asserts that Diebold omitted required supporting documentation from its application. *See id.* A Diebold representative testified that the DOE wanted Diebold to change the systems election management software such that it provided (1) the number of precincts in which a particular race was taking place; and (2) the number of precincts reporting results at the time of any intermittent reports. *See* Dkt. 171, p. 92–95. The Diebold optical scan system certified in Florida used the same election management software as that used in the touch screen system submitted for certification on June 14, 2002. *See id.* at 93. The DOE requested that the election management software used in the optical scan system be modified too. *See id.* at 96–97. On September 30, 2002, Diebold withdrew the application. *See id.* at 100; State Defendants' Exhibit 4, p. 33.

34. On September 30, 2002, Diebold applied for certification of its Accu Vote ES2001B V2 touch screen voting system with audio ballot capabilities. *See* State Defendants' Exhibit 4, p. 41. The DOE deemed the application incomplete. *See id.* at 41–42. On November 6, 2002, the application still incomplete, the DOE withdrew the application pursuant to DOE rules requiring vendors to remedy application defects within a certain time period. *See* Dkt. 168, p. 131–32; State Defendants' Exhibit 4, p. 41–42. The application remained incomplete because Diebold was unable to timely modify the election management software. *See id.*

35. On May 28, 2003, Diebold applied for certification of its Diebold Election System 2003 B touch screen voting system with audio ballot capability. *See* Dkt. 168, p. 132; State Defendants' Exhibit 4, p. 50. This application is pending. *See id.*

36. Paul Craft, chief of the Bureau of Systems Certification, which is part of the DOE, has an obligation to keep abreast of technological advances in voting systems and to work to bring new technologies into the state. *See* Dkt. 168, p. 9, 48.

37. In 1996 or 1997 Craft encouraged Sequoia, ES & S, and Global to apply for certification for their touch screen systems. *See* Dkt. 168, p. 104–05. In 1997 or 1998 Craft flew to Global's headquarters to again encourage it to apply for certification for its touch screen technology. *See* Dkt. 169, p. 27–28. Craft also encouraged Diebold to quickly make required changes to its touch screen system with audio ballot capabilities; raised the issue of "sip and puff" devices with ES & S; and encouraged Sequoia to create a blended system consisting of Sequoia's touch screen machines and ES & S's optical scan machines. *See* Dkt. 168, p. 45, 139–40; Dkt. 169, p. 35–36. In addition, Craft is involved in national organizations concerned with vot-

ing standards, exposing him to at least some technological advancements in voting systems. *See* Dkt. 168, p. 86–89; Dkt. 169, p. 27, 29.

38. The state has received requests to speed up the certification process. *See* Dkt. 168, p. 77. In a February 6, 2001, document entitled "Recommendations for the Governor's Select Task Force on Election Procedures, Standards and Technology," Stafford encouraged state action on certifying new voting technology. *See* Dkt. 169, p. 82–85; Plaintiffs' Exhibit 123, p. 5. The document provided:

> Currently, there are significant restrictions and hurdles in the certification process for a touch screen system. I believe that this area should be thoroughly reviewed, compared with other states, and a system adopted that could help us expedite the adoption of touch screen technology throughout the state.

Plaintiffs' Exhibit 123, p. 5.

39. The December 30, 2002, report from the 2002 Governor's Task Force on Election Procedures, Standards and Technology provides:

> [T]estimony at the 2002 Select Task Force meeting provided by a panel of local supervisors from small to mid-size counties indicated that Florida's standards might be too rigorous. These local supervisors stated that the relationship between vendors and the state certification officials could be improved. They went on to add that the current relationship may hinder vendors from bringing cutting-edge technology into the state for certification.

Plaintiffs' Exhibit 1, p. 31.

40. Amid concerns that the Florida Voting System Standards required too lengthy a process, the DOE reduced various time periods set forth in the Florida Voting System Standards to expedite the certification process. *See* Dkt. 168, p. 131–32.

41. Twenty-nine Florida counties use touch screen voting systems. *See* Dkt. 168, p. 50–51; Plaintiffs' Exhibits 135–137. Hillsborough, Dade, Broward, Nassau, Pinellas, Indian River and Pasco Counties use touch screen voting systems with audio ballot capabilities. *See* Dkt. 168, p. 51–52. Highlands County uses a blended system with one touch screen machine with audio ballot and one optical scan machine per precinct. *See id.* at 52. Lee County uses touch screens with audio ballots, although it is not clear whether one touch screen machine with audio ballot is available in each precinct. *See id.* Sumpter County has purchased a touch screen voting system with audio ballot capabilities but it is not clear whether or not audio ballots are actually available in Sumpter County. *See id.* at 53.

42. Pasco County, Florida, purchased the ES & S touch screen voting system in October 2001. *See* Dkt. 167, p. 160–61, 167–68. Pasco County has successfully used the ES & S system. *See id.* at 173.

43. During the 2002 election, Dade and Broward Counties failed to open all of their precincts by 7:00 a.m. and failed to initially download the results from all of the machines. *See* Dkt. 168, p. 74–75, 169–70. The failure stemmed from not permitting sufficient time for the large, multilingual ballots to boot up on the ES & S machines and logistical problems such as getting all of the machines to precincts and poll worker training. *See* Dkt. 168, p. 74–76, 169–70. Following this election, local officials from Dade and Broward County criticized the State's certification standards for failing to take into account the counties' needs for a trilingual ballot and the time it took to boot up the voting system. *See* Plaintiffs' Exhibit 1, p. 31.

44. Harris County, Texas, purchased the Hart InterCivic eSlate Electronic Voting System in May or June 2001. *See* Dkt. 167, p. 71–73. One Disabled Access Unit, which permits visually and manually impaired voters to vote without assistance, was purchased for each voting precinct. *See id.* at 73. Harris County has successfully used the eSlate voting system. *See id.* at 82.

45. The Georgia Secretary of State convinced the Georgia legislature to purchase a Diebold touch screen voting system for the entire state in time for the November 2002 election. *See* Dkt. 167, p. 100–01, 111–12, 116. At least one voting machine with audio ballot capabilities was available in each precinct. *See id.* at 116. The Diebold system was well received in Georgia. *See id.* at 118.

46. The touch screen voting system used in Georgia is not identical to the various Diebold touch screen systems unsuccessfully submitted for certification in Florida. *See* Dkt. 168, p. 134–35.

47. The Diebold system used in Georgia provides for final voter review of a ballot before it is cast from the bottom of the ballot to the top. *See* Dkt. 171, p. 90–91.

48. The certification process in Georgia takes no more than one to three days. *See* Dkt. 167, p. 103.

## II. Conclusions of Law

Plaintiffs assert that Defendants violated Title II of the Americans With Disabilities Act, 42 U.S.C. § 12131–12165(ADA), Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(RA), and the implementing regulations promulgated under these statutes. Title II of the ADA provides:

> Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132. Similarly, Section 504 of the Rehabilitation Act provides in pertinent part:

> No otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

29 U.S.C. § 794(a).[2]

Plaintiffs contend that Stafford (1) violated 28 C.F.R. § 35.151(b) by purchasing a voting system that is not readily accessible to Plaintiffs; (2) violated 28 C.F.R. § 35.160 by failing to provide a means of communication that permits Plaintiffs to communicate their votes as effectively as non-disabled voters, by failing to furnish auxiliary aids that permit Plaintiffs an equal opportunity to participate in and enjoy the benefits of voting, and by failing to give primary consideration to the auxiliary aids requested by Plaintiffs; and (3) violated the "generic" discrimination clause of the ADA by subjecting Plaintiffs to discrimination by purchasing a voting system that imposes burdens on Plaintiffs not imposed on non-disabled voters. Plaintiffs assert that the State Defendants violated the ADA and the RA by failing to certify readily accessible voting systems.

---

**2.** Under both the ADA and the RA, Congress mandated the promulgation of implementing regulations that would be consistent with each other. *See* 29 U.S.C. § 794(a); 42 U.S.C. § 12134(a)-(b).

## A. Defendant Stafford

### 1. Accessibility of the Voting System

■ Section 35.151 of Title 28 of the Code of Federal Regulations provides:

(a) *Design and construction.* Each facility or part of a facility constructed by, on behalf of, or for the use of a public entity shall be designed and constructed in such manner that the facility or part of the facility is *readily accessible to and usable by* individuals with disabilities, if the construction was commenced after January 26, 1992.

(b) *Alteration.* Each facility or part of a facility altered by, on behalf of, or for the use of a public entity in a manner that affects or could affect the usability of the facility or part of the facility shall, *to the maximum extent feasible,* be altered in such manner that the altered portion of the facility is *readily accessible to and usable by* individuals with disabilities, if the alteration was commenced after January 26, 1992.

28 C.F.R. § 35.151(a)-(b)(emphasis added).[3] Since voting equipment plainly falls within the expansive definition of "facility" contained in the regulations, *see* 28 C.F.R. § 35.104, these standards apply to Duval County's purchase of new voting equipment in 2002. The standard for alterations, rather than new construction, is applicable in the instant case.

■ The Diebold optical scan voting system purchased by Duval County is not readily accessible to visually or manually impaired voters. Plaintiffs are unable to vote using the Diebold optical scan system without third-party assistance. If it was feasible for Duval County to purchase a readily accessible system, then the Plaintiffs' rights under the ADA and the RA were violated.

At the time the City purchased the optical scan system, it was technologically and financially feasible to employ a voting system readily accessible to visually impaired voters. The DOE had certified an ES & S voting system with audio ballot capabilities. Contrary to Stafford's assertions, state certification established that the ES & S system met accuracy and reliability standards and the requirements of the Federal Election Commission and the Florida Voting Systems Standards. While Stafford did not like certain features of the ES & S touch screen system-e.g., the manner in which the machines were "booted up" and "downloaded," such concerns do not constitute technical infeasibility. The stringent certification standards and process in Florida ensure that a certified voting system is not a substandard voting system. In addition, other jurisdictions within Florida and outside of Florida provided accessible equipment around the same time, indicating technical feasibility.[4]

Similarly, it was financially feasible for the City to purchase a voting system accessible to visually impaired voters. While a touch screen system was more expensive than an optical scan system, at least in the short-term, in light of the financing options and the overall size of Duval County's financial resources, Stafford failed to establish that a touch screen system was not financially feasible. In addition, Stafford did not investigate the cost of a blended system incorporating one touch screen system per precinct alongside of an optical

---

3. While the following discussion utilizes regulations issued under the ADA, regulations implementing the Rehabilitation Act contain similar standards. *See* 28 C.F.R. §§ 39.151, 39.160.

4. The Court notes that no evidence was presented concerning the security of touch screen voting systems against illegal intrusions.

scan machine, which would have been less expensive than an entirely touch screen system. Also, other jurisdictions' (both in Florida and around the country) acquisition of touch screen voting systems indicates the financial feasibility of such a system. Finally, at least some of the higher cost of a touch screen system would be recouped over time because of the decreased costs of paper ballots.[5]

Although Stafford did acquire three Diebold touch screen machines with audio ballot capabilities under the assumption that they would be certified prior to the September 2002 election, this acquisition does not bring Stafford into compliance with the ADA and the RA. The Diebold touch screen machines remain uncertified and thus, unusable. Even if the machines had been certified, three machines in a central location would not make the altered facility-the new voting system-readily accessible. Duval County is a geographically large county, and requiring Plaintiffs, who already lack the mobility that non-disabled voters have, to travel downtown does not satisfy the accessibility standard.

As to manually impaired voters, the issue of feasibility is more complicated. When Plaintiffs have generally referred to voting systems accessible to manually impaired voters they have spoken of "jelly switches" and "sip and puff" devices attached to touch screen machines. Nevertheless, during trial, Bell illustrated that he could vote without assistance and without "jelly switches" or "sip and puff" devices by using his mouth stick to tap on an ES & S touch screen. To the extent "jelly switches" and "sip and puff" devices need to be attached to a touch screen machine for it to be accessible, it was not feasible for Stafford to provide such a voting sys-

tem. At the time Duval County purchased its new voting system, no voting system with "jelly switches" or "sip and puff" capabilities was certified in Florida. Accordingly, Defendant Stafford cannot be held responsible under the ADA or RA for failing to provide machines with "jelly switch" or "sip and puff" capabilities.

However, to the extent a touch screen system is accessible to at least some manually impaired voters, the analysis is the same as set forth above for visually impaired voters. That is, with regard to Plaintiff Bell, Defendant Stafford could have fulfilled his obligations under the ADA and RA by providing the ES & S touch screen system, which, without further accommodation from the State or the County, would have permitted Bell to vote with his mouth stick. This voting, as demonstrated in Court, would not have required any third party assistance. Accordingly, Plaintiffs are entitled to a declaratory judgment with regard to their claims against Stafford to the extent a touch screen voting system would have permitted them to vote unassisted.

For the reasons set forth above, Plaintiffs are entitled to declaratory judgment that Defendant Stafford violated 28 C.F.R. § 35.151(b) as to the visually impaired and the manually impaired.

### 2. Effective Communication

■ Plaintiffs assert that visually and manually impaired voters are unable to communicate as effectively as non-disabled voters and have not been provided auxiliary aids that allow them an equal opportunity to participate in and enjoy the benefits of the program of voting. Stafford responds that what constitutes an accept-

---

**5.** The Court notes that, when recommending the purchase of the Diebold optical scan system, Stafford also recommended that Duval County adopt a touch screen system within two to four years.

able auxiliary aid is broad and specifically includes third-party assistance, the key being whether the auxiliary aid provided results in effective communication. Stafford asserts that the individual Plaintiffs have been able to vote with third-party assistance and, thus, were able to effectively communicate their votes. In addition, Stafford asserts he is not required to act pursuant to 28 C.F.R. § 35.160 if such action would fundamentally alter the nature of the activity provided or would result in undue financial or administrative burdens.

Title 28 C.F.R. Section 35.160 provides:

(a) A public entity shall take appropriate steps to ensure that communications with applicants, participants, and members of the public with disabilities are as effective as communications with others.

(b)(1) A public entity shall furnish appropriate auxiliary aids and services where necessary to afford an individual with a disability an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity conducted by a public entity.

(2) In determining what type of auxiliary aid and service is necessary, a public entity shall give primary consider-

ation to the requests of the individual with disabilities.

"The public entity shall honor the [disabled person's] choice unless it can demonstrate that another effective means of communication exists or that use of the means chosen would not be required under § 35.164." [6] 28 C.F.R. Pt. 35 App.

The phrase "auxiliary aids and services" includes:

(1) Qualified interpreters, notetakers, transcription services, written materials, telephone handset amplifiers, assistive listening devices, assistive listening systems, telephones compatible with hearing aids, closed caption decoders, open and closed captioning, telecommunications devices for deaf persons (TDD's), videotext displays, or other effective methods of making aurally delivered materials available to individuals with hearing impairments;

(2) Qualified readers, taped texts, audio recordings, Brailled materials, large print materials, or other effective methods of making visually delivered materials available to individuals with visual impairments;

(3) Acquisition or modification of equipment or devices; and

**6.** Section 35.164 provides:

This subpart does not require a public entity to take any action that it can demonstrate would result in a fundamental alteration in the nature of a service, program, or activity or in undue financial and administrative burdens. In those circumstances where personnel of the public entity believe that the proposed action would fundamentally alter the service, program, or activity or would result in undue financial and administrative burdens, a public entity has the burden of proving that compliance with this subpart would result in such alteration or burdens. The decision that compliance would result in such alteration or burdens

must be made by the head of the public entity or his or her designee after considering all resources available for use in the funding and operation of the service, program, or activity and must be accompanied by a written statement of the reasons for reaching that conclusion. If an action required to comply with this subpart would result in such an alteration or such burdens, a public entity shall take any other action that would not result in such an alteration or such burdens but would nevertheless ensure that, to the maximum extent possible, individuals with disabilities receive the benefits or services provided by the public entity.

(4) Other similar services and actions. 28 C.F.R. § 35.104. However, the list of auxiliary aids and services provided in Section 35.104 "is not an all-inclusive or exhaustive catalogue of [all those] possible or available," 28 C.F.R. Pt. 35, App. A, and the examples listed demonstrate that third-party assistance is an acceptable possible auxiliary aid or service. *See* 28 C.F.R. § 35.104 (including qualified interpreters, notetakers, and qualified readers). Thus, the third-party assistance provided to disabled voters is an auxiliary aid or service. The issues remain, however, whether the communications with visually and manually impaired voters are as effective as communications with other voters and whether the auxiliary aids provided—i.e., third-party assistance—affords visually and manually impaired voters an equal opportunity to participate in the activity of voting.

■ While Plaintiffs assert that Stafford violated 28 C.F.R. § 35.160 because visually or manually impaired voters are not able to vote in the same or similar manner as non-disabled voters, this is not the standard under 28 C.F.R. § 35.160. As noted above, the standard is whether communication with visually and manually impaired voters is as effective as communication with others and whether visually and manually impaired voters are afforded an equal opportunity to participate in and enjoy the benefits of voting. Plaintiffs presented no evidence that communication with visually and manually impaired voters is not as effective as communication with non-disabled voters. All three individual Plaintiffs have been able to vote with third-party assistance. While the visually impaired Plaintiffs testified to concern about whether their votes were accurately reflected, there is no evidence to suggest that their votes were not accurately communicated via third-party assistance. Similarly, there is evidence that visually and manually impaired voters have consistently been able to vote in Duval County elections using third-party assistance, which indicates that visually and manually impaired voters have been afforded an equal opportunity to participate in and enjoy the benefits of voting.

Plaintiffs, citing *Tugg v. Towey,* 864 F.Supp. 1201 (S.D.Fla.1994), assert that third-party assistance is not as effective as voting equipment that permits visually and manually impaired voters to vote without assistance because there is a chance that ballot choices will be miscommunicated through third-party assistance. In *Tugg,* the plaintiffs were hearing-impaired individuals and their families receiving mental health counseling. The plaintiffs alleged violation of the ADA and the RA because Defendants failed to provide counselors with sign language ability and who understood the deaf community and instead utilized counselors aided by sign language interpreters. The plaintiffs presented evidence (1) that, because sign language "does not lend itself to word-for-word translation into spoken English," the chance of miscommunication between a therapist and a "client is much greater when an interpreter is used"; and (2) that, because it was likely that different interpreters would be used each session, there was a greater likelihood that an interpreter would "fail to grasp the true meaning of what the parties are trying to convey." *Id.* at 1206. The court, considering the propriety of issuing a preliminary injunction requiring the defendants to provide counselors with sign language ability and with an understanding of the deaf community, held that the plaintiffs presented sufficient evidence that they were denied the benefits of mental health services provided

to non-disabled persons.[7] *See id.* at 1204, 1208.

*Tugg* is distinguishable from the instant case. In addition to being at a different procedural posture, in the instant case, Plaintiffs have not presented similar evidence of the likelihood of miscommunication. While the visually impaired Plaintiffs have expressed concern that there votes might not be accurately recorded, there was no evidence that their verbal selection of candidates would be misconstrued by their assistant. Orally communicating a vote does not involve the ambiguities and problems of articulation faced in mental health counseling sessions. In addition, the ability to have a person of the voter's choosing or two poll workers assist visually impaired voters further protects against miscommunication.

Consequently, the Court concludes that Stafford did not violate the effective communication provisions of 28 C.F.R. § 35.160 by purchasing a voting system that does not permit visually and manually impaired voters to vote without assistance.

### 3. *"Generic" Discrimination*

■ In the instant case, Plaintiffs assert that Stafford violated the "generic" discrimination prohibition of 42 U.S.C. § 12132 because the recently acquired voting equipment requires Plaintiffs to vote in a manner materially different from other voters. Specifically, Plaintiffs contend that they are forced to vote in a more burdensome manner than other voters because Plaintiffs have to reveal their votes to others; risk having their votes not marked as they wish or revealed to others; and are subject to being delayed when they vote if they have to wait for a third-party assistant in order to be able to vote.

As quoted above, the clause containing the "generic" prohibition against discrimination in Section 12132 provides that "no qualified individual with a disability shall, by reason of such disability, ... be subjected to discrimination by" a public entity. 42 U.S.C. § 12132. The legislative history indicates that Congress chose "not to list all the types of actions that are included within the term 'discrimination,' as was done in titles I and III." H. REP. 101–485(II), 84 (1990), *reprinted in* 1990 U.S.C.C.A.N. 303, 367; *see also Ellen S. v. Fla. Bd. of Bar Examiners*, 859 F.Supp. 1489, 1493 (S.D.Fla.1994). Instead, Congress intended "that the forms of discrimination prohibited by [Section 12132] be identical to those set out in the applicable provisions of titles I and III" and that the regulations to Title II reflect said congressional intent. H. REP. 101–485(II), 84 (1990), *reprinted in* 1990 U.S.C.C.A.N. 303, 367.

Congress directed the Attorney General to promulgate regulations implementing 42 U.S.C. § 12131–12134 and that such regulations "include standards applicable to facilities." 42 U.S.C. § 12134(a), (c). Con-

7. The *Tugg* court considered the plaintiffs' claims under both 28 C.F.R. § 35.160(a), (b)(1) and 28 C.F.R. § 35.130(b)(1)(I)-(iii), which provides:

> (b)(1) A public entity, in providing any aid, benefit or service, may not, directly, or through contractual, licensing, or other arrangements, on the basis of disability—
> (i) Deny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit or service;

> (ii) Afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit or services that is not equal to that afforded others;
> (iii) Provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided others.

*See* 28 C.F.R. § 35.130(b)(1)(i-iii).

gress also directed that the regulations concerning "program accessibility" and "existing facilities" be consistent with the regulations applicable to the RA in 28 C.F.R. Pt. 39. *See* 42 U.S.C. § 12134(b). The regulations promulgated pursuant to this congressional mandate adopted different standards for new construction/alterations and existing facilities,[8] as was done in the regulations applicable to the RA,[9] "because the cost of retrofitting is often prohibitive." 28 C.F.R. Pt. 35 App. A.

In *Bledsoe v. Palm Beach County Soil & Water Conservation Dist.*, 133 F.3d 816, 821 (11th Cir.1998), the Eleventh Circuit briefly discussed the "generic" prohibition against discrimination concluding that the phrase although Title II of the ADA referred to services, programs or activities, that it nevertheless applied to employment discrimination, even in cases where Title I of the ADA did not apply. *See id.* at 819, 821. The court concluded that the final clause of Title II is a " 'catch-all phrase that prohibits all discrimination by a public entity.' " *Id.* at 822 (quoting *Innovative Health Sys., Inc. v. City of White Plains*, 117 F.3d 37, 44-45 (2d Cir.1997)).

In the instant case, Plaintiffs' claim under the "generic" discrimination provision is premised upon the degree to which the recently purchased voting equipment is accessible and how Plaintiffs must vote using the equipment. As noted above, specific

regulations have been promulgated, pursuant to an express congressional mandate, concerning standards for facilities. Thus, at least in the instant case, Plaintiffs' "generic" discrimination claim appears to be coterminous with its claim under 28 C.F.R. § 35.151. To hold otherwise would possibly permit an inconsistent result-i.e., it would be possible for Stafford to comply with the specific requirement of Section 35.151 and still violate the "generic" discrimination provision of 42 U.S.C. § 12132 based upon the accessibility of the voting system. This would undermine the specific regulations concerning this point. Thus, the Court will not separately address this claim based upon the conclusion that it is to be resolved in the same manner as Plaintiffs' claim under 28 C.F.R. § 35.151.[10]

**B. The State**

In its August 19, 2003, Order, the Court granted summary judgment for the State Defendants as to visually impaired voters. Plaintiffs' remaining claim is that Hood and Kast wrongfully refused to certify a voting system that would allow Bell, who is manually impaired, to vote without assistance. As held in the Court's August 19, 2003 Order, Plaintiffs have standing to assert their claim against Hood and Kast.

Turning to the substance of Plaintiffs' claims, the Court concludes that Plaintiffs

---

**8.** *See Ass'n for Disabled Ams. v. City of Orlando*, 153 F.Supp.2d 1310, 1317 (M.D.Fla. 2001); 28 C.F.R. §§ 35.150(a) and 35.151(a)-(b). Section 35.150(a) provides:

> (a) General. A public entity shall operate each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities.

(subsections (a)(1)-(3) not included here). Section 35.151(a)-(b) is quoted above in Section II.A.1.

**9.** Sections 39.150 and 39.151 of Title 39 of the Code of Federal Regulations employ a "program accessibility" standard for existing facilities and a "facility accessibility" standard for new or altered facilities.

**10.** Stafford also asserts that the Help America Vote Act, 42 U.S.C. § 15301, *et seq.* (HAVA), bars the relief sought by Plaintiffs. The Court rejects this argument for the reasons stated in its August 19, 2003, Order on the cross Motions for summary judgment. *See* Dkt. 124, p. 20 n. 9.

have presented no evidence that the DOE wrongfully failed to certify a voting system that permitted Bell to vote without assistance. The Hart InterCivic eSlate system was the only system that Plaintiffs established that Bell could use without assistance but that was not certified by the DOE. The evidence presented at trial indicates that the eSlate system failed objective Phase II testing, specifically the Precinct Count System Software and the Central Count System Software Florida Qualification Tests. Plaintiffs do not assail the propriety of these tests or dispute that the eSlate system failed these tests nor do they present evidence as to what standards apply in jurisdictions utilizing the eSlate system. The only evidence that calls the State Defendants' decision into question is the fact that the system has been successfully used in Texas. Nevertheless, this fact alone does not prove that the State Defendants wrongfully failed to certify the system under Florida standards.

In addition, at trial, the Court also questioned whether the State courted new systems and technologies for certification in Florida. While the DOE could have done more to court new accessible technologies, the Court is not convinced that any acts or omissions by the State Defendants rise to the level of an ADA or a RA violation. Although Craft was not familiar with certain technological advancements touted by Plaintiffs and was not aware of other state's efforts to adopt accessible technology, he did take steps to encourage new technologies. In 1996 or 1997 Craft encouraged Sequoia, ES & S, and Global to apply for certification for their touch screen systems and in 1997 or 1998 Craft flew out to Global's headquarters to again encourage it to apply for certification for its touch screen technology. Craft also encouraged Diebold to quickly make required changes to its touch screen system with audio ballot capabilities and encouraged Sequoia to create a blended system consisting of its touch screen machines and ES & S's optical scan machines. In addition, Craft raised the issue of "sip and puff" devices with ES & S and has been involved in national organizations concerned with voting standards, exposing him to at least some technological advancements.[11] The Court concludes that there is no affirmative obligation on the State to seek out all cutting edge accessibility technology, and that the State's actions, undertaken through Mr. Craft, were sufficient to fulfill its obligations under the ADA and the RA.

Upon consideration thereof, it is hereby **ORDERED and ADJUDGED:**

1. Plaintiffs are entitled to declaratory judgment that Defendant Stafford violated 28 C.F.R. § 35.151(b) as to the visually and manually impaired Plaintiffs, to the extent the manually impaired Plaintiffs could have voted unassisted via touch screen technology.

2. Defendant Stafford is **DIRECTED** to have at least one voting machine that permits visually impaired voters to vote without assistance at 20% of the polling

---

11. The Court recognizes that Plaintiffs presented evidence that the certification process in Florida is more onerous than in some other states and that a certain amount of tension exists between DOE officials and vendors. See Dkt. 169, p. 97–98. There is some evidence that, because of this tension, vendors may be hesitant to submit new technologies for certification. *See id.*

As one of the most populous states in the Union it seems unlikely that vendors would avoid Florida for long. In addition, a certain amount of tension is always likely to exist between regulators and those they regulate. Nevertheless, the DOE should ensure that such tensions do not hinder the certification of accessible voting systems.

places in Duval County. Not later than *April 12, 2004,* Stafford will file a report identifying the polling places at which he would locate the machines and an explanation of his choices, taking into account, *inter alia,* population density and transportation availability. Not later than *April 29, 2004,* Plaintiffs will file their comments regarding Stafford's plan.

3. If the Diebold touch screen machines with audio ballot capabilities are not certified *on or before May 14, 2004,* and/or the Diebold touch screen machines do not permit a manually impaired voter to vote alone via mouth stick, Defendant Stafford is **DIRECTED** to select and procure another vendor's acceptable touch screen machines with audio ballot capabilities in time for use during the August 2004 primaries.

4. Defendant Stafford is **DIRECTED** to keep the Court apprised of any significant events regarding Diebold's application for certification of its touch screen machines with audio ballot capabilities, including filing a status report *on May 14, 2004,* informing the Court whether said Diebold machines have been certified.

5. Defendants Hood and Kast are entitled to judgment against the Plaintiffs, which shall be entered following receipt of a status report or reports regarding Diebold's currently pending application for certification. A final report shall be filed as events occur and in any case not later than May 17, 2004, even if it is a negative report.

6. Defendant Stafford's Motion to Strike (Dkt. 180) is **DENIED**.